IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

KELLY T. NEESON                              )
                                             )
Plaintiff,                                   )
                                             )
v.                                           )
                                             )        Case No. 2:12-CV-51-SNLJ-SPM
                                             )
                                             )
CAROLYN W.  COLVIN,[1]                       )
Acting Commissioner of Social Security,      )
                                             )
Defendant.                                   )


**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

     This is an action under 42 U.S.C. § 405(g) for judicial review of the final decision of

Defendant Carolyn W. Colvin, the Acting Commissioner of Social Security, denying the

application of Plaintiff Kelly T. Neeson for disability insurance benefits ("DIB") under Title II of

the Social Security Act, 42 U.S.C. §§ 401 *et seq.*, (the "Act").  This matter was referred to the

undersigned United States Magistrate Judge for review and a recommended disposition pursuant

to 28 U.S.C. § 636(b).  The undersigned recommends that the decision of the Commissioner be

reversed and the case remanded for further proceedings.

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013.
Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin should
therefore be substituted for Michael J. Astrue as the defendant in this case.

# I. PROCEDURAL HISTORY

On October 27, 2009, Plaintiff applied for DIB, alleging that he had been disabled since December 20, 2008. (Tr. 108). On January 28, 2010, his application was denied. (Tr. 60-64). On March 12, 2010, Plaintiff filed a Request for Hearing by Administrative Law Judge (ALJ). (Tr. 65-66). After a hearing on October 18, 2010, the ALJ issued an unfavorable decision. (Tr. 13-24). On March 7, 2011, Plaintiff filed a Request for Review of Hearing. (Tr. 9). On May 30, 2012, the ALJ denied Plaintiff's Request for Review. (Tr. 1-3). Thus, the decision of the ALJ stands as the final decision of the Commissioner of the Social Security Administration.

# II. FACTUAL BACKGROUND

## A. BACKGROUND

Plaintiff was born on May 15, 1968. He has a GED. (Tr. 34). He last worked in December of 2008 at the Macon County Sheltered Workshop driving a truck, a job he held for six months. (Tr. 34, 36). Prior to that, he had been off work for six or seven months; prior to that, he worked at Mid-Am Building Supply doing loading and unloading. He was terminated from that job in November 2007 for missing work due to his schizophrenia. (Tr. 35-36). Prior to that, he worked as a warehouseman and as a parks and recreation worker. (Tr. 36).

Plaintiff testified that his mental health symptoms and diabetes interfere with his work. (Tr. 36). He suffers from paranoid schizophrenia, experiences anxiety, and believes people are thinking things about him. (Tr. 37-38). He feels very fearful or nervous about twice a week, for half a day or so. When he has these symptoms, he tries to get away from everyone and stay in his own area. (Tr. 38). He also finds it difficult to concentrate during those times, which was a problem he had when he was employed. (Tr. 39). Plaintiff also has extreme thoughts of hopelessness, helplessness, and worthlessness about once a week; when these occur, he isolates

himself. (Tr. 38). Plaintiff also has problems with his temper and sometimes yells; this happens about once a week. (Tr. 40-41). Plaintiff has a shake in his limbs that is there most of the time. (Tr. 41)

Plaintiff has had problems with sleep in the past; in December 2008, he was sleeping on average only three hours a night. (Tr. 41-42). He now takes medication for that; it results in him sleeping for ten or twelve hours a night; when he wakes up he still feels fatigued. (Tr. 42).

Plaintiff believes that the biggest problem he would have with going back to work would be concentrating, as well as nervousness and "the thoughts of other people." (Tr. 42).

In October 2009, Plaintiff was hospitalized for about ten days for psychosis; he was thinking weird thoughts, smelling things, hearing things, and seeing things that were not real. (Tr. 42-43). Since then, he has occasionally had those kinds of symptoms; they typically last about half a day. When he talks to his treaters about it, they change his medicine. (Tr. 43).

Plaintiff sees Corrie Willis and Dr. Levy. (Tr. 39). He takes medicines that have improved his paranoia and nervousness somewhat. (Tr. 40).

At the hearing, the ALJ asked Plaintiff's attorney to direct his attention to any and all treating source opinions in the record regarding Plaintiff's physical and mental limitations. (Tr. 49). The attorney stated that he had made a request for an opinion, but that the treating source had requested to see the Plaintiff first; the attorney indicated that Plaintiff would see the treating source two days after the hearing. (Tr. 50). The ALJ stated that he was going to close the record as of that day, but that the attorney was invited to send him anything upon receipt, stating, "All you have to do is include a little cover letter explaining the good cause you had for not having it at the time of the hearing" and ask that the documentary record can be reopened and the new documents added to the file. (Tr. 50-51).

**B.  RECORDS OF TREATING SOURCES[2]**

### 1.  RECORDS OF BOONE HOSPITAL CENTER (FEBRUARY 2008)

From February 27, 2008 to February 29, 2008, Plaintiff was admitted to Boone Hospital Center for headaches and hypertension.  (Tr. 227).  While Plaintiff was at the hospital, cognitive testing was average or normal, and a Beck Depression Inventory showed moderate depression.  (Tr. 225).  At discharge, his medications included Paxil.[3]  (Tr. 227-28).

### 2.  RECORDS OF JEFFERSON CITY MEDICAL GROUP (JULY 2008)

On July 10, 2008, Plaintiff went to the Jefferson City Medical Group to see Dr. Christopher Case, M.D.  Plaintiff complained of fatigue, foot pain, unclear thinking, and memory problems.   It was noted that Plaintiff had stopped work in November and had developed depression and anxiety.  He reported trying Paxil and Seroquel[4] but stated that they had not helped.  (Tr. 235).  Plaintiff's mental status, mood, and affect were all normal.  (Tr. 236).  Dr. Case suggested adding Cymbalta[5] to settle foot pain and underlying severe depression and anxiety.  (Tr. 237).

---

[2] Because the sole issue Plaintiff raises on appeal is that the ALJ failed to consider the opinion of Nurse Corrie Willis concerning Plaintiff's mental impairments, this summary is focused on records relevant to Plaintiff's mental impairments.   The undersigned has also reviewed the medical records relevant to Plaintiff's alleged physical impairments.

[3] Paxil is a brand name for paroxetine and is used to treat depression, panic disorder, social anxiety disorder, obsessive-compulsive disorder, generalized anxiety disorder, and posttraumatic stress disorder.  http://www.nlm.nih.gov/medlineplus/druginfo/meds/a698032.html.

[4] Seroquel is a brand name for quetiapine and is used to treat the symptoms of schizophrenia and bipolar disorder.  http://www.nlm.nih.gov/medlineplus/druginfo/meds/a698019.html.

[5] Cymbalta is a brand name for duloxetine and is used to treat depression and generalized anxiety disorder, as well as ongoing bone or muscle pain.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a604030.html.

### 3. RECORDS OF JULIA KNAPP, FNP (OCTOBER 2007-DECEMBER 2011)

Plaintiff received treatment from Julia Knapp, FNP, on several occasions in 2007 through 2011. (Tr. 288-98).

At his October 2007 visits, he complained of fatigue. (Tr. 296-97)

On November 14, 2007, he reported that he was having feelings of paranoia and persecution that began with an incident at his last job, and that was why he had switched jobs. He also reported that his anxiety was getting worse. Ms. Knapp diagnosed paranoia and persecution mania, set Plaintiff up with counseling, and continued him on Paxil. (Tr. 294).

On December 13, 2007, Plaintiff reported confusion, profound paranoia, and psychotic breaks to the point where he was not sleeping for over a week; notes state that he was "some [sic] better now." He was diagnosed with paranoia and started on BuSpar[6] and Seroquel. (Tr. 293).

On December 20, 2007, Plaintiff reported being not too happy on Seroquel, because he was sleeping and eating all the time. He reported that his mood had improved significantly and he was not having as much paranoia. However, he had an episode where he got on Web MD, had paranoia about his medications, and was up all night. Ms. Knapp assessed confusion and paranoid state NOS. She reduced his Seroquel dosage, recommended he have a brain MRI, and noted that his counselor was getting him set up for a psychiatric evaluation. (Tr. 292).

On January 4, 2008, Plaintiff wanted to try getting off of Seroquel, and Ms. Knapp indicated that he could try to do so. (Tr. 291).

On January 21, 2008, Ms. Knapp noted that when Plaintiff went off the Seroquel, he instantly began not to sleep and had episodes of chest pain. He felt like he needed to be guided

---

[6] BuSpar is a brand name for buspirone and is used to treat anxiety disorders. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a688005.html.

and was unable to make decisions on his own.  (Tr. 290).  Ms. Knapp diagnosed confusion.  (Tr. 291).

On May 22, 2008, Plaintiff complained of fatigue and reported that he had stopped Paxil about 4 weeks prior and was feeling more like himself.  (Tr. 289).

On December 3, 2009, Ms. Knapp noted that Plaintiff had "somewhat of an altered affect."  She assessed schizophrenia and paranoia.  (Tr. 288).

On March 23, 2010, Plaintiff reported that he "feels like mentally he is improving and he does seem to be more like his old self" and "feels mentally more stable."  (Tr. 372).

On January 5, 2011, Ms. Knapp noted that Plaintiff "has not been having any breakthrough with his paranoia" and that "he feels more like himself than he has in a long time."  (Tr. 404).

On December 1, 2011, Plaintiff reported some headaches, dizziness, and fatigue.  (Tr. 409).

### 4.  RECORDS OF AUDRAIN MEDICAL CENTER (OCTOBER 2009)

On October 8, 2009, Plaintiff went to the Emergency Department at Audrain Medical Center, complaining of depression, and he was admitted to Audrain Medical Psychiatric Services "for depression and to rule out dissociative disorder with increased anxiety."  (Tr. 239, 261-67). At the time of admission, he was on no psychiatric medications, though he had tried Paxil and trazodone[7] in the past.  (Tr. 240).

On October 9, it was noted that he had been having some memory lapses, walking away from home and coming back hours later with no memory of where he had been; he had had increased anxiety over the past couple of years, which he described as being uneasy and worried

---

[7] Trazodone is used to treat depression.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a681038.html.

in social situations; he had noticed an increase in depression since losing his job a year and a half ago; he reported paranoid ideations; he felt that people could read and control his mind and that radio and TV were talking directly to him. On mental status examination, he was poorly dressed and groomed, his behavior was anxious, his mood was depressed and uneasy, his affect was anxious; his thought processing was vague, he had some hallucinations, paranoia, and delusions; his insight and judgment were poor, and his motivation was poor; however, his eye contact was good, his speech was normal, his memory was grossly intact, he was alert and oriented times three, and his intelligence was normal. (Tr. 238-41, 245-49).

On October 10, Plaintiff saw Dr. George Comfort, M.D. Dr. Comfort's impression was that Plaintiff might be having some paranoid delusions, but he stated, "I tend to think it is not schizophrenia." (Tr. 260).

At various points during his hospital stay, doctors prescribed and adjusted Plaintiff's medications. (Tr. 241-42). By the date of discharge on October 19, 2009, his mood was bright and cheerful, he denied suicidal ideations or paranoia, and his Global Assessment of Functioning (GAF) score[8] had increased to 60 (from 20 at admission). At discharge, he was diagnosed with

_____

[8] The Global Assessment of Functioning Scale (GAF) is a psychological assessment tool wherein an examiner is to "[c]onsider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness"; it does "not include impairment in functioning due to physical (or environmental) limitations." *Diagnostic and Statistical Manual of Mental Disorders (DSM-IV)*, 32 (4th ed. 1994). A GAF of 51-60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *DSM-IV* 32.

psychosis, not otherwise specified, and his psychiatric medications were Depakote,[9] Prozac,[10] and Geodon.[11]  (Tr. 242-43).

### 5.  RECORDS OF PREFERRED FAMILY HEALTHCARE AND NURSE CORRIE WILLIS (OCTOBER 2009-FEBRUARY 2012)

On October 22, 2009, three days after leaving the hospital, Plaintiff was seen at Preferred Family Healthcare for a psychological/clinical assessment and for treatment by Nurse Corrie Willis.  (Tr. 276-82, 285-87, 367-69).  Plaintiff reported that he was "tired and worn out with the medicines"; he had trouble focusing during the interview and had to get up and walk around to stay awake; and he had limited insight, poor judgment, slow and soft speech, issues with memory and concentration, helplessness and hopelessness, low self-esteem, racing thoughts, anxiety, panic, anger issues, paranoia, and low energy.  (Tr. 277-78, 367).  Ms. Willis diagnosed schizophrenia, paranoid type, and assigned a GAF of 40.[12]  (Tr. 278, 286, 368-69).  She recommended psychotherapy and prescribed Prozac, a decreased dosage of Geodon, and Depakote.  (Tr. 287).

On November 2, 2009, Plaintiff returned to Ms. Willis and reported being "a lot better," being "not as much a zombie," "having more content time," being "less worried about stuff," and

---

[9] Depakote is a brand name for valproic acid and is used to treat seizures, bipolar disorder, and migraine headaches.  http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682412.html.

[10] Prozac is a brand name for fluoxetine and is used to treat depression, obsessive-compulsive disorder, and panic attacks.  http://www.nlm.nih.gov/medlineplus/druginfo/meds/a689006.html.

[11] Geodon is a brand name for ziprasidone and is used to treat schizophrenia and bipolar disorder.  http://www.nlm.nih.gov/medlineplus/druginfo/meds/a699062.html.

[12] A GAF score between 31 and 40 indicates "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoid friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)."  *DSM-IV* 32.

having "more energy." He denied paranoia. However, he indicated that he still could not focus. (Tr. 283).

On December 2, 2009, Plaintiff reported, "[T]here are still some days I feel I hit a brick wall." His mood was mildly anxious, he had some irritability and mild paranoia, and he was "touchy." He said his thought processes were "much better," and his paranoia was described as "mild." (Tr. 275).

On February 3, 2010, Plaintiff reported, "I have been pretty good." He was groomed, his affect was appropriate, his speech was normal, his thoughts were organized, he had no hallucinations, and his impulse and judgment control were good. His anxiety and delusions were stable. With regard to his mood, he stated, "I feel the med is a lifesaver." (Tr. 371).

On May 3, 2010, Plaintiff stated, "I can't complain" but also stated that "I still have mild worthless & what is the point." He stated, "the mental part is better, I physically can't do the jobs I had." However, he stated, "I sometimes wish I was dead." (Tr. 380).

On June 30, 2010, Plaintiff reported being up more and not taking naps. He also reported that he was not working and so was down on himself. His insight was low, his impulse control was poor, his judgment was impaired, and he had a flat affect. (Tr. 381).

On July 28, 2010, Plaintiff reported that he still did not have motivation and that he was nervous around people. He had thoughts of hopelessness, helplessness, and worthlessness, and he indicated that not working contributed to these thoughts. (Tr. 382).

On October 19, 2010, Plaintiff saw Ms. Willis, reporting that he had "a lot of depression," had "more suicidal thoughts," got anxious, and slept 10-12 hours a night. He stated that he was thankful that he no longer saw or heard things. His affect was flat. His appearance was groomed, his attitude was cooperative, he had no hallucinations, his memory was good, his

impulse control was good, his judgment was good, and his process of thinking was organized. It was noted that he had low mood, fatigue, anxiety/worry, avolition, paranoia/suspiciousness, and "talks to self." Ms. Willis started him on Lamictal.[13] (Tr. 395).

On November 1, 2010, Plaintiff returned to Ms. Willis and reported that he had not taken his medication that morning. He was well-groomed and cooperative; his attitude was labile; his mood was depressed; he had thoughts of hopelessness and worthlessness; and he had a flat affect, paranoia and suspiciousness, and talked to himself. Ms. Willis decreased his Geodon dosage and started him on Invega.[14] (Tr. 396).

On November 15, 2010, Plaintiff reported that he had "no bad thoughts," had no thought broadcasting, and had gotten up earlier the last few days. He stated, "I don't feel depressed." He was groomed, his attitude was cooperative, his affect was labile, his speech was normal, his thoughts were organized, he had no suicidal ideas or hallucinations, his insight was self-aware, and his judgment was good. However, he had poor impulse control. In the review of his sensorium, it was noted that his flat affect continued. Ms. Wilson stopped his Geodon and continued his other medications. (Tr. 397).

On December 29, 2010, Plaintiff reported that his appetite was worse and that his sleep "was off but more routine now." He stated that he had a "zombie feeling sometimes." (Tr. 398).

In records dated after the ALJ's decision, Plaintiff returned on several occasions, generally reporting improved symptoms. For example, he reported at various times in 2011 that his depression was "a lot better," that he was "not anxious," that he was "feeling much better on these meds than past meds," and that he had "been pretty good." (Tr. 399-401, 422). However,

---

[13] Lamictal is a brand name for lamotrigine and is used to treat seizures, depression, and bipolar disorder. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a695007.html.

[14] Invega is a brand name for paliperidone and is used to treat the symptoms of schizophrenia. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a607005.html

at some points he did have paranoia, suspiciousness, avoidant behavior, sleep problems, and/or disorganized behavior. (Tr. 422-24). In addition, on December 29, 2011, he was assigned a GAF score of 40. (Tr. 416).

## C. OPINION EVIDENCE

### 1. PSYCHIATRIC REVIEW TECHNIQUE FORM AND MENTAL RFC ASSESSMENT BY MICHAEL STACY, PH.D. (JANUARY 28, 2010)

On January 28, 2010, Michael Stacy, Ph.D., completed a Psychiatric Review Technique Form for Plaintiff. (Tr. 345-56). Dr. Stacy found that Plaintiff had a medically determinable impairment of Psychotic Disorder NOS vs. Schizophrenia. (Tr. 347). He found Plaintiff had a mild restriction of activities of daily living; moderate difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace; and one or two episodes of decompensation of extended duration. (Tr. 353). He noted that although Plaintiff had some symptoms quite consistent with schizophrenia, it was not clear that all the criteria were met. He noted that Plaintiff's impairment "was briefly quite severe, but has steadily improved." (Tr. 356).

On the same day, Dr. Stacy completed a Mental RFC Assessment. (Tr. 357-360). He opined that Plaintiff had moderate limitations in the ability to understand and remember detailed instructions; the ability to carry out detailed instructions; the ability to maintain attention and concentration for extended periods; the ability to work in coordination with or proximity to others without being distracted by them; the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; the ability to interact appropriately with the general public; the ability to accept instructions and respond appropriately to criticism from supervisors; the ability to respond appropriately to changes in the work setting; the ability

to travel in unfamiliar places or use public transportation; and the ability to set realistic goals or make plans independently of others. Dr. Stacy found no significant limitations in the other areas assessed. (Tr. 357-58). He further noted that Plaintiff retains the ability to understand and remember simple instruction; can carry out simple work instruction; can maintain adequate attendance and sustain an ordinary routine without special supervision; can interact adequately with peers and supervisors in a work setting that has limited demands for social interaction; and can adapt to most usual changes common to a competitive work setting. (Tr. 358-59).

### 2. MEDICAL ASSESSMENT OF ABILITY TO DO WORK-RELATED ACTIVITIES (MENTAL) BY NURSE CORRIE WILLIS

On November 1, 2010, Ms. Willis completed a Medical Assessment of Ability to Do Work-Related Activities (Mental). Ms. Willis indicated that Plaintiff had poor or no ability to deal with work stresses; fair[15] ability to relate to co-workers, deal with the public, and maintain attention/concentration; and good or very good ability to follow work rules, use judgment, interact with supervisors, and function independently. She noted that his flat affect, poor concentration, and increasing paranoia and stress supported her assessment. (Tr. 384). She found that he had poor or no ability to understand, remember, and carry out complex job instructions; poor to fair ability to understand, remember, and carry out detailed but not complex job instructions; and very good ability to understand, remember, and carry out simple job instructions, due to thought broadcasting and thought insertion with schizophrenia. She stated that he had poor or no ability to relate predictably in social situations and a fair ability to demonstrate reliability due to his paranoia and anxiety but had a good ability to maintain

---

[15] "Fair" is defined on the form as, "Ability to function in this area is seriously limited, but not precluded." (Tr. 384).

personal appearance and behave in an emotionally stable manner. She further noted that he had suicidal thoughts. (Tr. 385).

### D. VOCATIONAL EVIDENCE

Vocational Expert Julie Harvey testified before the ALJ. (Tr. 44-49). She characterized Plaintiff's past work as follows: warehouse worker (medium exertion, SVP 2, unskilled); short haul truck driver (medium, SVP 3, semi-skilled); salvage laborer (medium, SVP 2, unskilled); convenience store cashier (light, SVP 2, unskilled); and park maintenance worker (medium, SVP 2, unskilled). (Tr. 44).

In his first hypothetical, the ALJ asked the VE to consider an individual who was the same age, education, and work experience as the claimant; who could do work at the light exertional level; who needed to avoid concentrated exposure to hazards such as dangerous, moving machinery and unprotected heights; who was able to understand and remember simple instructions; who could carry out simple work instructions and maintain adequate attendance and sustain an ordinary routine without special supervision; who could interact adequately with peers and supervisors in a work setting that has limited demands for social interaction; and who was able to adapt to most usual changes common to a competitive work setting. (Tr. 44-45). The VE testified that such an individual could not do Plaintiff's past work, specifically noting that the convenience store cashier job had a more than limited demand for social interaction. (Tr. 46). She testified that such an individual could perform jobs as a housekeeping cleaner (*Dictionary of Occupational Titles (DOT)* code 323.687-014, light, SVP 2, 10,700 jobs in Missouri and 440,100 in the national economy); merchandise marker (*DOT* code 209.587-034, light, SVP 2, 28,100 jobs in Missouri and 1,540,900 in the national economy); and advertising material distributor

(*DOT* code 230.687-010, light, SVP 2, 2,300 jobs in Missouri and 102,400 jobs in the national economy).  (Tr. 47).

In his second hypothetical, the ALJ described an individual with the same physical and environmental limitations but who could not understand, remember, or carry out even simple instructions; could not make judgments on even simple work-related decisions; could not respond appropriately to supervision, co-workers, or usual work situations; and could not deal with changes even in a routine work setting.  (Tr. 47-48).  The VE testified that Plaintiff could not perform his past work and that there would be no other unskilled, entry-level jobs for such a person.  (Tr. 48).

Plaintiff's attorney then asked the VE to consider a hypothetical individual who had the physical limitations of the ALJ's first hypothetical but who was moderately limited in the ability to complete a normal workday and moderately limited in the ability to respond appropriately to changes in a work setting and to set realistic goals and make plans independently of others.  (Tr. 52-53).  She testified that such a person would be able to work as a convenience store cashier. (Tr. 56).

### III.     STANDARD FOR DETERMINING DISABILITY UNDER THE ACT

The Social Security Act defines as disabled a person who is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A); *see also Hurd v. Astrue*, 621 F.3d 734, 738 (8th Cir. 2010).  The impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which

exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. § 1382c(a)(3)(B).

A five-step regulatory framework is used to determine whether an individual claimant qualifies for disability benefits. 20 C.F.R. § 404.1520(a); *see also McCoy v. Astrue*, 648 F.3d 605, 611 (8th Cir. 2011) (discussing the five-step process). At Step One, the ALJ determines whether the claimant is currently engaging in "substantial gainful activity"; if so, then he is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(i); *McCoy*, 648 F.3d at 611. At Step Two, the ALJ determines whether the claimant has a severe impairment, which is "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities"; if the claimant does not have a severe impairment, he is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1520(c); *McCoy*, 648 F.3d at 611. At Step Three, the ALJ evaluates whether the claimant's impairment meets or equals one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "listings"). 20 C.F.R. § 404.1520(a)(4)(iii). If the claimant has such an impairment, the Commissioner will find the claimant disabled; if not, the ALJ proceeds with the rest of the five-step process. 20 C.F.R. § 404.1520(d); *McCoy*, 648 F.3d at 611.

Prior to Step Four, the ALJ must assess the claimant's "residual functional capacity" ("RFC"), which is "the most a claimant can do despite [his] limitations." *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20 C.F.R. § 404.1545(a)(1)); *see also* 20 C.F.R. § 404.1520(e). At Step Four, the ALJ determines whether the claimant can return to his past relevant work, by comparing the claimant's RFC with the physical and mental demands of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(f); *McCoy*, 648 F.3d

at 611.  If the claimant can perform his past relevant work, he is not disabled; if the claimant cannot, the analysis proceeds to the next step.  *Id.*  At Step Five, the ALJ considers the claimant's RFC, age, education, and work experience to determine whether the claimant can make an adjustment to other work in the national economy; if the claimant cannot make an adjustment to other work, the claimant will be found disabled.  20 C.F.R. § 404.1520(a)(4)(v); *McCoy*, 648 F.3d at 611.

Through Step Four, the burden remains with the claimant to prove that he is disabled. *Moore*, 572 F.3d at 523.  At Step Five, the burden shifts to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy.  *Id.*; *Brock v. Astrue*, 674 F.3d 1062, 1064 (8th Cir. 2012).

## IV.  DECISION OF THE ALJ

Applying the foregoing five step analysis, the ALJ here found that Plaintiff had not engaged in substantial gainful activity since December 20, 2008, the alleged onset date.  (Tr. 18). He found Plaintiff had the following severe impairments: diabetes mellitus; psychotic disorder, not otherwise specified, versus schizophrenia; hypertensive cardiovascular disease; and obesity. The ALJ found that Plaintiff did not have an impairment or combination of impairments that met or equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 18). He found that Plaintiff had the RFC to perform light exertion work with the following restrictions: avoid concentrated exposure to hazards such as dangerous moving machinery and unprotected heights; can understand, remember and carry out simple instructions; can maintain adequate attendance, and sustain an ordinary routine without special supervision; can interact adequately with peers and superiors in a work setting that has limited demands for social interaction; and can adapt to most usual changes common to a competitive work setting.  (Tr.

20).  He found Plaintiff unable to perform any past relevant work.  (Tr. 23).  Relying on the testimony of the VE, the ALJ found that there are jobs existing in significant numbers in the national economy that Plaintiff can perform.  (Tr. 23-24).  Thus, he found that Plaintiff had not been under a disability, as defined in the Act, from December 20, 2008 through the date of his decision.  (Tr. 24).

## V.  DISCUSSION

### A.  STANDARD FOR JUDICIAL REVIEW

The court's role in reviewing the Commissioner's decision is to determine whether the decision "'complies with the relevant legal requirements and is supported by substantial evidence in the record as a whole.'"  *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009) (quoting *Ford v. Astrue*, 518 F.3d 979, 981 (8th Cir. 2008)).  "Substantial evidence is 'less than preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion.'"  *Renstrom v. Astrue*, 680 F.3d 1057, 1063 (8th Cir. 2012) (quoting *Moore v. Astrue*, 572 F.3d 520, 522 (8th Cir. 2009)).  In determining whether substantial evidence supports the Commissioner's decision, the court considers both evidence that supports that decision and evidence that detracts from that decision.  *Id.*  However, the court "'do[es] not reweigh the evidence presented to the ALJ, and [it] defer[s] to the ALJ's determinations regarding the credibility of testimony, as long as those determinations are supported by good reasons and substantial evidence.'"  *Id.* at 1064 (quoting *Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006)).  "If, after reviewing the record, the court finds it possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision.'"  *Partee v. Astrue*, 638 F.3d 860, 863 (8th Cir. 2011) (quoting *Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005)).

**B. THE ALJ'S FAILURE TO CONSIDER THE REPORT OF NURSE CORRIE WILLIS IN DETERMINING PLAINTIFF'S RFC**

Plaintiff's sole argument on appeal is that the ALJ's RFC assessment was not based on substantial evidence in the record as a whole because the ALJ did not consider the opinion of Corrie Willis, a nurse who treated him on many occasions for his mental impairments and then filled out a Medical Assessment of Ability to Do Work-Related Activities (Mental) in which she indicated that Plaintiff had very limited abilities to deal with work stresses, relate to co-workers, deal with the public, maintain attention and concentration, understand and carry out detailed but not complex job instructions, relate predictably in social situations, and demonstrate reliability. Defendant argues that the ALJ properly considered all of the evidence in the record, including Plaintiff's credibility, in determining Plaintiff's RFC, and that there are several reasons why Ms. Willis's opinion should be discounted.

As a nurse, Ms. Willis is not is not an "acceptable medical source" under the regulations, but is rather an "other" medical source. 20 C.F.R. §§ 404.1513(a) & (d)(1); Social Security Ruling 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006) ("SSR 06-03p"). Thus, although Ms. Willis treated Plaintiff, she was not a "treating source" whose medical opinion may be entitled to controlling weight. *See Tindell v. Barnhart*, 444 F.3d 1002, 1005 (8th Cir. 2006); *see also* SSR 06-03p, 2006 WL 2329939, at *2 (noting that "only 'acceptable medical sources' can be considered treating sources, as defined in 20 C.F.R. 404.1502 and 416.902, whose medical opinions may be entitled to controlling weight"). The ALJ has more discretion when evaluating an opinion from an "other" medical source than when evaluating an opinion from an acceptable medical source. *Raney v. Barnhart*, 396 F.3d 1007, 1009 (8th Cir. 2005). However, the Social Security Administration has recognized the importance of considering opinions from sources other than "acceptable medical sources":

> With the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not "acceptable medical sources," such as nurse practitioners, physician assistants, and licensed clinical social workers, have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists. Opinions from these medical sources, who are not technically deemed "acceptable medical sources" under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file.

SSR 06-03p, 2006 WL 2329939, at *3. In addition, "the adjudicator generally should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." *Id.* at *6. In weighing opinions from other sources, the factors to be considered may include the length and frequency of the relationship, how consistent the opinion is with other evidence, the degree to which the source presents relevant evidence to support an opinion, how well the source explains the opinion, whether the source has a specialty or area of expertise related to the impairment(s), and other factors. *Id.* at *4.

Here, nothing in the ALJ's decision indicates that he considered Ms. Willis's opinion at all. It is clear that consideration of Ms. Willis' opinions may have had an effect on the outcome of the case: her opinion indicated that Plaintiff had poor or no ability to deal with work stresses or relate predictably in social situations, as well as serious limitations in the ability to maintain attention and concentration and demonstrate reliability—limitations not reflected in the RFC assessed by the ALJ. Moreover, Ms. Willis had treated Plaintiff on numerous occasions, and she was the only examining or treating source who offered any opinion regarding his mental abilities. In similar situations, courts have generally remanded for the ALJ to consider the opinion of the other source. *See Gramlisch v. Barnhart*, 464 F. Supp. 2d 876, 881-82 (E.D. Mo.

2006) (remanding in part because the ALJ did not mention the opinions of the nurse practitioner who treated Plaintiff; stating that the nurse, "while not a treating *physician*, did treat Plaintiff on many occasions" and that "her opinions are other evidence to be considered on the record as a whole"); *Watson v. Astrue*, No. 08-6006-NKL-SSA, 2009 WL 4728991, at *5 (W.D. Mo. 2009) (remanding where the ALJ neglected to discuss the RFC assessment of the claimant's nurse practitioner; noting, "Such a review is particularly important in the instant case where [the nurse practitioner] is the only examining practitioner to give an assessment of [the claimant's] physical residual functional capacity"); *Morrison v. Astrue*, No. 4:11CV3135, 2012 WL 760568, at *9 (D. Neb. 2012) (remanding where the ALJ failed to discuss the opinions of Plaintiff's nurse practitioner; noting that the nurse practitioner "saw [the plaintiff] more than any physician or other medical professional"); *Lee v. Astrue*, No. C10-0069, 2011 WL 167252, at *9 (N.D. Iowa Jan. 19, 2012) (finding that the ALJ's failure to address or consider the opinions of the plaintiff's chiropractor required remand, despite the fact that a chiropractor is not an "acceptable medical source"; emphasizing that the chiropractor had a long history of treating the plaintiff and that his opinions were probative in determining whether the plaintiff was disabled).

In its brief, Defendant offers numerous reasons why Ms. Willis's opinion should be discounted. However, in determining whether the ALJ properly considered opinion evidence, the reviewing court must review the ALJ's discussion of the opinion evidence rather than relying solely on the post hoc rationale offered by the Commissioner. *See Evans v. Astrue*, No. 4:08CV3266, 2010 WL 1664973, at *10 (D. Neb. April 22, 2010) ("The Commissioner in his brief has endeavored to provide a post hoc rationale for discrediting [a nurse practitioner's] opinion by pointing out inconsistencies in the record, but my review is concerned with what the ALJ actually considered."); *May v. Astrue*, No. 09-CV-3480-NKL, 2010 WL 3257848, at *9

(W.D. Mo. Aug. 16, 2010) ("The Commissioner's post hoc analysis of the medical records in this case is insufficient when none of these reasons were provided in the ALJ's opinion. . . . Generally, the court will not decide whether a source's opinion is well founded, but whether the ALJ provided sufficient reasons for rejecting the opinion of a treating source."). Moreover, notwithstanding the reasons Defendant offers for discounting Ms. Willis' opinions, the undersigned notes that some of her treatment notes do support her opinions, including her notes from June through December 2010 reflecting that Plaintiff had low insight, poor impulse control, a flat affect, thoughts of hopelessness and worthlessness, suicidal thoughts, paranoia, anxiety, and a "zombie feeling sometimes." (Tr. 381-82, 395-98). The undersigned cannot determine that the ALJ would necessarily have assessed the same RFC had he considered and evaluated Ms. Willis's opinions. On remand, the ALJ should determine the appropriate weight to be given to Ms. Willis's opinions in determining Plaintiff's RFC.

Defendant notes that Ms. Willis's opinion was submitted after the hearing, and after the ALJ closed the record, and that Plaintiff's attorney did not follow the ALJ's instruction to include with the opinion a letter explaining why there was good cause to reopen the record. However, Defendant has cited no authority suggesting that Plaintiff's technical failure to comply with the ALJ's instruction regarding a cover letter would warrant the ALJ's disregarding of this clearly relevant evidence. Indeed, the provisions of the Social Security Administration's *Hearings, Appeals, and Litigation Law Manual* ("HALLEX") cited by Defendant suggest that when a claimant's representative indicates at the hearing that he or she has additional evidence to submit, the ALJ should leave the record *open* and set a time limit for submitting the additional evidence—things the ALJ here did not do. *See* HALLEX I-2-6-78, 1993 WL 751904 (Sept. 2, 2005) ("If the claimant and the representative have additional evidence to submit . . . the ALJ

will inform the claimant and the representative that the record will remain open after the hearing to allow them time to submit the additional evidence."); HALLEX I-2-7-20, 1993 WL 751909 (Sept. 2, 2005) ("When a claimant or representative requests time to submit evidence or written arguments after the hearing, the ALJ must set a time limit for the posthearing actions to be completed . . ."). Here, Plaintiff's attorney explained at the hearing the nature of the evidence he planned to submit, the time frame in which he planned to submit it, and the reason why it was not ready at the time of the hearing. (Tr. 49-50). The undersigned can find no valid reason why the ALJ would have refused to consider it.

In sum, given that Ms. Willis's opinion included significant limitations not reflected in the ALJ's RFC, and given the lack of other opinion evidence from other sources who treated or examined Plaintiff, the undersigned finds that the ALJ's failure to discuss her opinion renders his analysis incomplete, and that remand is required. *See Draper v. Barnhart*, 425 F.3d 1127, 1130 (8th Cir. 2005) ("While a deficiency in opinion-writing is not a sufficient reason to set aside an ALJ's finding where the deficiency [has] no practical effect on the outcome of the case, inaccuracies, incomplete analyses, and unresolved conflicts of evidence can serve as a basis for remand.") (citation omitted). On remand, the ALJ should consider Ms. Willis's opinion in accordance with the framework described in SSR 06-03p.

# VI.   <u>CONCLUSION</u>

For the reasons set forth above, the undersigned finds that the decision of the Commissioner was not supported by substantial evidence.

Accordingly,

**IT IS HEREBY RECOMMENDED** that decision of the Commissioner of Social Security be **REVERSED** and that this case be **REMANDED** under Sentence Four of 42 U.S.C. § 405(g) for reconsideration and further proceedings consistent with this opinion.

The parties are advised that they have 14 days to file written objections to this Report and Recommendation. The failure to file timely written objections may waive the right to appeal issues of fact.

<u>/s/Shirley Padmore Mensah</u>         
SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE

Dated this <u>23rd</u> day of <u>July</u>, 2013.